**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISCTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **RICARDO D. PALACIOS,** | § | |
| **Individually and as General** | § | |
| **Partner for the JUAN SALINAS** | § | |
| **RANCH, LTD,** | § | |
| **a Texas Limited Partnership,** | § | |
| | § | |
| **Plaintiffs,** | § | **Civil Action No. 17-cv-244** |
| | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **CHIEF PATROL AGENT** | § | |
| **MARIO MARTINEZ,** | § | |
| **UNKOWN AGENTS OF THE** | § | |
| **UNITED STATES CUSTOMS** | § | |
| **AND BORDER PROTECTION,** | § | |
| **AND TEXAS RANGER ERNESTO** | § | |
| **SALINAS OF THE TEXAS** | § | |
| **DEPARTMENT OF PUBLIC SAFETY** | § | |
| **TEXAS RANGER DIVISION** | § | |
| | § | |
| | § | |
| **Defendants.** | | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**
**FOR GENERAL & DECLARATORY JUDGEMENT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

    **NOW COME,** RICARDO D. PALACIOS, individually, and JUAN SALINAS RANCH,

LTD., a Texas Limited Partnership by and through its General Partner, Ricardo D. Palacios,

Plaintiffs herein, by and through their attorneys of record, Messrs. David Almaraz and Raul Casso,

and bring this their "*Plaintiffs' First Amended Complaint,*" against the *U.S. CBP Chief Patrol*

*Agent, Mario Martinez, Unknown/Unnamed Agents,* and *Texas Ranger Ernesto Salinas of the*

*Texas Department of Public Safety Texas Ranger Division* (Defendants), and would respectfully show the Court the following:

## Section I.

## <u>INTRODUCTORY OVERVIEW OF CASE</u>

**1.**     Plaintiffs own and live on a ranch situated at approximately the 35-mile marker, IH-35, east side frontage road, 3 miles south of Encinal, Texas more than 25 miles beyond the external boundary of the United States. Over the last several years, after an ugly, physical confrontation that Plaintiff, Ricardo D. Palacios' son, had with CBP agents at the IH-35 Checkpoint 29 miles north of Laredo, Plaintiffs' have encountered agents of U.S. Customs and Border Protection (CBP) going onto their land, at will, without any warrant or legal authority, without landowner consent, over landowners' objection, and without any warrant or exigent circumstances that would permit such intrusions upon Plaintiffs' private property. On each such occasion, Plaintiffs confronted the CBP agents they encountered and warned them that they, the agents, were trespassing onto private property. On each such occasion, Plaintiffs ordered CBP off of their land to no avail. On some of those occasions, CBP agents insisted that they were within "25 miles," and continued with their intrusions onto Plaintiffs' property. Plaintiff, Ricardo D. Palacios brought this issue to the attention of CBP headquarters by written correspondence directed to the then chief patrol agent who responded with assurances that the matter would be "looked into." No results were forthcoming, none were ever had, and the trespassing continued. Finally, and most recently, Plaintiff, Ricardo D. Palacios, encountered a surveillance camera affixed to a Mesquite tree on the subject property within close proximity to the curtilage thereon, and removed it from the tree. Subsequently,

officials from U.S. CBP and the Texas Ranger contacted Plaintiff claiming ownership of the camera, demanding its immediate return, with the latter party, the Texas Ranger, threatening to file criminal charges for theft upon Plaintiffs' persistent refusal to surrender the camera. This action follows.

## Section II.

## <u>JURISDICTION</u>

**2.**     This Court has jurisdiction over this matter pursuant to:

a) 28 U.S.C. §1331(a) because the controversy arises out of the Constitution or laws of the United States, namely the interpretation and applicability of U.S. Code, Title 8, §1357(a)(3), Powers of Immigration Officers and Employees, and Powers without a warrant, and the 4th Amendment of the Federal Constitution;

b) A citizen suffering injury to a constitutionally protected interest may invoke the general federal question jurisdiction of the District Courts to obtain an award of monetary damages against the responsible federal official; and,

c) 28 U.S.C. §1343(a)(3) because this action seeks to redress the depravation, under color of State Law, of a right secured by the Constitution of the United States.

**3.**     This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 because the state law claims levelled herein are part of the same case or controversy under Art. III of the United States Constitution, namely, on information and belief, the Texas Ranger, acting in formal or

informal cooperation with U.S. CBP has allowed the use of its department resources and equipment to conduct the unwarranted police search(es) as alleged herein.

**4**.     In addition, Plaintiffs file this *First Amended Complaint* seeking remedies pursuant to Fed. R. Civ. P. 57 because Plaintiffs have suffered injury in fact, as will be expanded upon hereinbelow; the injury suffered is directly attributed to the unlawful intrusions by CBP and the Texas Ranger onto Plaintiffs' property, and, a declaration by this court of the relative rights of the parties will right the wrong and prevent its reoccurrence. As will be shown, the government threatened Plaintiff with criminal prosecution. Where threatened action by the government is concerned, a plaintiff need not expose himself to liability before bringing suit to challenge the basis for the threat. Putting Plaintiffs to choose between abandoning their rights or risking prosecution is a dilemma of the sort that the Declaratory Judgement Act was designed to ameliorate.

**5**.     Finally, this Court has jurisdiction to award attorney's fees, expert fees, costs to the Plaintiffs, and, where appropriate punitive damages pursuant to Fed. R. Civ. P. 57, 65, and the *Declaratory Judgement Act*, 28 U.S.C. §2201, *et seq*.

## Section III.

## <u>VENUE</u>

**6**.     Venue is proper before this court because the events or omissions giving rise to the Plaintiffs' claims occurred in the Southern District of Texas, Laredo, Division, and the property that is the subject of the action is situated therein. 28 U.S.C. §1391.

**Section IV.**

<u>**PARTIES**</u>

**7**.      Plaintiffs are: Ricardo D. Palacios individually, and JUAN SALINAS RANCH LTD, a Texas Limited Partnership, in which title to the subject property resides, appearing by and through its General Partner, Ricardo D. Palacios.

**8**.      Defendants are the Chief Patrol Agent, Mario Martinez, for the U.S. CBP; unknown/unnamed agents of the UNITED STATES CUSTOMS AND BORDER PROTECTION, a governmental entity. Process was served on these defendants by delivering a copy of the summons and complaint to Assistant United States Attorney for the Southern District of Texas, Laredo Division, Mr. Hector Ramirez at 11204 McPherson Rd., Ste. 100-A, Laredo, Texas, 78045. Service was also made on the United States by delivering a copy of the summons and the complaint, via certified mail, to AUSA Hector Ramirez at the same address.

**9**.      Pursuant to FRCP 4(i)(1)(B), the undersigned sent a copy of the Original Complaint and summons via certified mail to the Attorney General of the United States at Washington D.C. A copy of the cover letter accompanying the copies of the complaint and summons is attached hereto as Exhibit "A."

**10**.     Defendant, Texas Ranger Ernesto Salinas of the TEXAS DEPARTMENT OF PUBLIC

SAFETY, TEXAS RANGER DIVISION, a governmental agency, was served with process at his

office located at 207 W. Del Mar, Laredo Texas 78045.


**Section V.**

**<u>STATEMENT OF FACTS</u>**

**11**.     Plaintiffs own and live on a ranch situated at approximately the 35-mile marker on

Interstate 35, east side frontage road, 3 miles south of Encinal, Texas, approximately 34 miles

beyond the external boundary of the United States.[1]


**12**.     Plaintiffs' troubles with Defendants began at about 1 a.m. on April 4, 2010 when

Plaintiff's, Ricardo D. Palacios' two sons drove up to the U.S. Border Patrol checkpoint on I.H.

35, 29 miles north of Laredo, Texas. Plaintiff's sons were on their way home at their ranch close

to Encinal, Texas, approximately six miles north of the checkpoint on the same highway, namely,

IH-35. At the checkpoint primary inspection, Plaintiff's son, Ricardo D. Palacios, Jr., was asked

where he lived. He refused to answer and was then referred to secondary inspection. Upon parking

the vehicle at the secondary inspection area, Plaintiff's son, who was sitting in the passenger seat

of the vehicle they were driving, was pounced upon without warning by approximately ten

government agents who appeared suddenly out of the darkness. The agents, in one swift,

uninterrupted motion, hauled Plaintiff's son out of the vehicle, body-slammed him to the ground,

---

[1] By using the "My Map" facility available at the Texas General Land Office, Plaintiffs measured the closest distance between the subject property and the nearest bend in the Rio Grande at the southern border of the United States to be 27.5065 bird-flight miles.

handcuffed him, and then carted him off to a detention cell inside the checkpoint station where he was locked up. Plaintiff's other son was left unharmed.

**13.**     One agent, with a last name of "Champion," partook in the assault on Plaintiff's son with particular zeal, later throwing Ricardo D. Palacios, Jr., while yet handcuffed, to the floor of the detention cell he had been placed in.

**14.**     Plaintiff's son was released from custody about an hour and a half later.

**15.**     Later that same night, at approximately 3 a.m., Plaintiff's sons arrived at the front gate of Plaintiff Ricardo D. Palacios home. There they encountered an unmarked truck facing the gate with two or three CBP agents inside of it. The bed of the pick-up truck was equipped with a crisscross extension apparatus with a camera, perhaps night vision equipment, at the end of the extension. Plaintiff's sons confronted the agents. Plaintiff then received an alarming phone call from one of his other sons. As a result, Plaintiff looked out of a window of his home, and there at the front gate of his residence, Plaintiff saw the truck and the confrontation between Plaintiff's son and the agents that was by then in progress. Plaintiff drove his car to the front gate to also confront the agents. Plaintiff charged the agents with trespassing, ordered them off his ranch and warned them that he would call the Sheriff's department if they refuse to leave immediately. The agents responded by threatening to file assault charges against Plaintiff's son, Ricardo D. Palacios Jr. Instead of complying with Plaintiffs' order, a group of 8 to 10 more agents arrived at the scene apparently having been called as backup. The dozen or more agents now assembled like a gang of thugs, confronted the Plaintiff and his son at the front gate of Plaintiff's, Ricardo D. Palacios' home. Plaintiff and son insisted that the agents leave. One agent, name unknown, challenged

Plaintiff to, "Make us leave." At this juncture, a supervisor named Elwynn Sherman arrived and ordered the agents to, "bring the camera down." The supervisor then asked Plaintiff if he could have a private word with Plaintiff's son. Agreeing to this, Plaintiff's son and the supervisory agent stepped off to the side and had a private exchange. The substance of this exchange was regarding the incident where Plaintiff's son was roughed up at the hands of Border patrol as related in paragraphs 11-13, above. Afterwards, by then well past 3 a.m., the supervisor turned to Plaintiff and offered to end the present confrontation by "shaking hands and walking away [from it]." The gang of agents then disbanded, and departed.

16.     Since these awful incidents, and over the last several years, Plaintiffs' have encountered agents of U.S. Customs and Border Protection (CBP) going onto their land, roaming freely about, at will, day and night, without any warrant or legal authority, without landowner consent, over landowners' objection, and without exigent circumstances that would permit such intrusions upon private property.

17.     On each such occasion, where Plaintiffs encountered CBP agents roaming about Plaintiffs' private property as though it were a public parkland, Plaintiffs ordered CBP off of their land, telling them that they were trespassing but to no avail: Plaintiff's protestations made no difference to the agents and the unwarranted intrusions continued unabated.

18.     On some occasions, the U.S. CBP agents insisted that they were within "25 miles," within their rights, and bluntly told the Plaintiff that they could therefore do what they wanted.

**19.** U.S. CBP agents persisted in acting through according to their self-proclaimed, legal understanding, and continued with their unwarranted intrusions onto Plaintiffs' property.

**20.** On April 9, 2010, Plaintiff, Ricardo D. Palacios, forwarded a certified letter to U.S. Customs and Border Protection complaining of the unwarranted incidents on his premises urging that CBP's trespassing onto Plaintiff's property cease. A copy of that letter is attached hereto as Exhibit "B," and incorporated herein by reference.

**21.** U.S. CBP, responding to Plaintiff's April 9 correspondence by letter dated April 19, 2019, acknowledged the issue brought to its attention by Plaintiff, assured plaintiff that it, CBP, "…takes all complaints…very seriously," and that, "If corrective action is required, [that such would be taken]." A copy of U.S. CBP's April 19 letter is attached hereto as Exhibit "C," and incorporated herein by reference.

**22.** Notwithstanding U.S. CBP's assurances that the matter would be looked into and corrected if need be, the trespassing continued unabated with incidents occurring as recently as a few weeks preceding the filing of this cause of action. Examples follow.

**23.** After the exchange of letters as aforesaid, Plaintiff's son, Ricardo D. Palacios Jr., was awakened at night by his dog barking in alarm. Upon looking outside his home, Ricardo D. Palacios, Jr. encountered three or four agents investigating the outside and around his home with the use of flashlights. Plaintiff's son confronted the agents who claimed they were busy "tracking"

to which Plaintiff's son responded that they, the agents, were trespassing. The agents then departed.

24.     The next encounter of significance occurred approximately three years ago at the end of a day when, at dusk, Plaintiff, Ricardo D. Palacios, looked out his kitchen window to find a CBP agent, having already unlocked an oil company service entrance gate, driving into the ranch in an easterly direction. The particular gate referred to is located a couple of blocks away from Plaintiff's home. Plaintiff called his son, and together they intercepted and confronted the Border Patrol agent. Plaintiff questioned the agent as to how he gained entry onto the ranch. The agent responded by producing an "LPP key."

25.     The "LPP" key is a gate key belonging to Lewis Petro Properties, an oil and gas tenant of Plaintiffs' property. The LPP key opens a lock on the oil company service entrance. Upon the trial of this matter, Plaintiff will show that an "LPP key" was not given to U.S. CBP neither by Plaintiff nor by the oil and Gas tenants of the property.

26.     Upon questioning the CBP about how they obtained the LPP key, a CBP agent said, "I bought the key at the office, someone had to have gotten it [from Lewis Petro Properties]." Upon asking the "land-man" for Lewis Petro whether this was true, Plaintiff was assured, in no uncertain terms, that that explanation by the Border Patrol agent was contra-factual.

27.     Plaintiff and son told the CBP agent that he had no permission to be on the ranch despite the LPP key, and escorted him off the property.

**28.**     Subsequently, Plaintiff, Ricardo D. Palacios, encountered two CBP agents roaming aimlessly on Plaintiff's ranch. When asked what their purpose was, the agents claimed to be lost, and could not remember how or where they gained entry onto the property. Plaintiff, Ricardo D. Palacios, suspecting that the agents had used a certain gate located at the back of the ranch, escorted the agents to that gate and there let them out. The agents confirmed that that gate was the manner by which they had gained entry. After that incident, Plaintiff battened the gate to no longer allow for further entry.

**29.**     Later still, Plaintiff's son, Ricardo D. Palacios, Jr., encountered several U.S. CBP vehicles at the oil and gas service gate. After stopping them, Plaintiff's son advised the agents that they were trespassing. At about this time, another appeared from within the ranch and approached the gate to exit. Plaintiff's son asked the agents he originally encountered on this occasion who that might be, and was told, "that is sensor tech Garza."

**30.**     Thereafter, Plaintiff found embedded into the ground on his ranch, a ½ inch diameter, white fiberglass spike about two and a half feet long with a round, three-inch red reflector affixed at the top. The "spike" remains in possession of the Plaintiff.

**31.**     The final incident involving this sort of unlawful intrusion onto Plaintiffs' private property occurred approximately three weeks before the filing of this action when Plaintiff, Ricardo D. Palacios encountered a surveillance camera affixed to a tree on the subject property. The Mesquite

tree the camera was hidden in is located about one-half city block, a stones' throw, from the residence of Plaintiff's son. Plaintiff removed the camera from the tree and took possession of it.

**32.** Subsequently, officials from U.S. CBP and the Texas Ranger each contacted Plaintiff in turn, claiming ownership of the camera, and demanded its immediate return.

**33.** On one such phone call, a CBP agent, upon demanding a return of the camera in question represented to Plaintiff, Ricardo D. Palacios, that the camera belonged to the Texas Attorney General and that CBP had it pursuant to an agreement or program with the State of Texas referred to by the agent by an acronym that the agent was unsure of, although he garbled unintelligibly in a vain effort to express it.

**34.** The Texas Ranger, also in turn, demanded that the camera be returned to him—immediately—and threatened to file criminal charges for theft against Plaintiff upon Plaintiff's refusal to surrender the camera.

**35.** Plaintiff nevertheless, and despite the threats made by the Texas Ranger, refused to surrender the camera having found it attached to a Mesquite tree on his ranch not knowing who put it there, or why, to then find himself caught between competing claims for the camera by officers of two, separate law enforcement agencies: one State (the Texas Ranger), and the other Federal (U.S. CBP). Plaintiff Ricardo D. Palacios believed, and continues to believe, that the camera found its way in Plaintiffs' tree at the hands of both CBP and the Texas Rangers, acting in concert, and in violation of Plaintiffs' property and constitutional rights.

**36.** Plaintiffs maintain that the foregoing behavior by CBP and the Texas Ranger constitutes an on-going, concerted activity by Defendants characterized by a consistent and continued pattern of intrusions onto Plaintiff's private property without legal justification, in what may be characterized as *policing without permission*.

**37.** Plaintiffs maintain that Defendants' policing without permission, that began on the night of April 4, 2010 and continued until the filing of this lawsuit, constitutes a persisting and continuing *system of wrongful practices* by the Defendants that produced effects that may not manifest themselves individually except in cumulation over time.

**38.** Plaintiff does not know how long the surveillance camera remained attached to Plaintiffs' Mesquite tree. Plaintiff has since come to understand, based on information and belief, that the subject camera is part of "Operation Drawbridge," a government program administered by the Texas Rangers, by and through which Texas Rangers of the Texas Department of Public Safety (DPS), are partnered with agencies such as U.S. Border Patrol, and by which hundreds of similar cameras have been deployed throughout the border area.

**39.** What role "Drawbridge Cameras," such as that found by Plaintiffs hidden in a tree, play as a part of "Operation Drawbridge" will be explored in more detail below. For now, however, suffice it to say that the "Drawbridge Cameras" allow U.S. Border Patrol, as the fruits of its partnership with Texas Rangers, to have a virtual and continuous presence on private lands thereby enjoying uninterrupted access, 24/7, on any private property of their choosing. U.S. CBP thus conducts its

patrolling efforts on private property by remote control with the substantial aid and assistance from their partners, the Texas Rangers.

**41.** In this manner, that is, by surreptitiously installing a surveillance camera of private property without any permission, U.S. Border Patrol (CBP), in conjunction with the Texas Ranges, have circumvented the judicial oversight that 8 U.S.C. §1375(a)(3) requires of them. Judicial oversight is designed to maintain the checks and balances that the judiciary is supposed to have over the executive branch of government. Moreover, such oversight is <u>clearly mandated</u> by the legislative branch of our government according to its will as clearly expressed in the aforementioned statute: 8 U.S.C. §1357(a)(3).

**42.** The conduct of the Defendants, troubling as it is even when each violation, like an individual pin-prick, is viewed as a single phenomenon, constitutes a *continuing violation* over time that with the dots connected, forms a series of related acts from the inception until the present; a continuing chain of wrongful policing without permission neither from the Judiciary nor the private property owner, namely Plaintiffs.

**43.** As Plaintiffs will further show, the Defendants' continuing violation as outlined above was an organized scheme leading to and including the most recent violation, namely, the discovery of the "Drawbridge" surveillance camera on Plaintiffs' property.

**44.** Plaintiffs maintain that it is the cumulative effect of Defendants' wrongdoing rather than any discreet occurrence that gives rise to the present cause of action. The full, comprehensive

harmfulness of Defendants' actions is clearly perceived from the escalating, intensifying, and ripening nature of the government's policing without permission resulting in a harmful outcome that was not necessarily perceived at the onset, and to an insidious degree not perceived at all without the fortuitous discovery of the surveillance camera hidden in Plaintiffs' Mesquite tree.

**45.**     It is Plaintiffs' observation that Defendants, in using relatively inexpensive, electronic devices such as the "drawbridge camera" presented here, allows the government to do what until only recently it could not do without the substantial deployment of police resources. Using traditional surveillance for any extended period of time would be an expensive proposition to say the least, involving a large team of agents, multiple vehicles, and perhaps aerial assistance. Such surveillance would be rarely undertaken because it would be too difficult and costly beyond what police departments could afford. For that reason, such surveillance could happen only in an investigation of unusual importance. By using "drawbridge cameras," however, long-term monitoring has been turned into something relatively cheap and easy—at a different, societal cost, however. The prevalence of inexpensive technology increasingly eliminates the distinction between what private citizens keep private and what they display in public. All the government needs to do, as it did in the present case, is sneak a camera in some place where nobody knows. Thus, the decreasing cost of technology leaves us all vulnerable to government spying.

**46.**     Plaintiffs maintain that there is something creepy and un-American about such clandestine, surreptitious, 1984-style behavior on the part of Defendants—officers of the law.

47.     Plaintiffs maintain that each "bad act" committed by the Defendants as described herein, are essentially the same and involved the same subject matter in that all such bad acts include the same warrant-less, trespassing activity in violation of 8 U.S.C. §1357(a)(3).

48.     Plaintiffs further maintain that the continuing wrongs committed by Defendants were pursuant to an agency policy or program as will be further outlined below. Although each bad act, committed over time, was perpetrated by individual agents in conjunction with the Texas Ranger, some acts known to Plaintiff as stated herein, and many more similar acts unknown to Plaintiffs but suspected, the pattern and frequency of the acts committed by the defendants throughout the period that Plaintiffs complain of, fostered an environment of hostility on Plaintiffs' private property thereby disrupting the peace and quiet of his homestead.

49.     Each individual act as described herein, except the last when the camera was discovered, share common elements: stand-offs and confrontations between Plaintiffs and government agents; Plaintiffs ordering the agents to leave for trespassing; defiance on the part of law enforcement who would ultimately leave when they felt like it, culminating, finally, in the escalation of activity marked by the sneaky placement at some point in time, of a surveillance camera in a Mesquite tree very close to the home of Plaintiff's, Ricardo D. Palacio's son.

50.     The government's infiltration onto Plaintiffs' private property was as bold and defiant as it was clandestine and shrouded in a veil of secrecy as government agents and the Texas Ranger planted surveillance equipment on private property without telling anyone—even when the law required them to.

51.     The harm Plaintiff complains of does not depend on the individual actors perpetrating the "bad acts" outlined herein. The trespassing activity continued despite the changing of Agents in Charge over time such that the warrantless intrusion onto Plaintiffs' property did not depend on the intent of any individual. Instead, what we are presented with here is an example of the continuing presence on Plaintiffs' private property by government agencies in what was a concerted, "rogue" agency action.

52.     By motion accompanying Plaintiffs' *Original Complaint*, and now this *First Amended Complaint*, Plaintiffs tenders the camera for deposit into the registry of the court to be safely kept there as evidence of Defendants' trespass pending the outcome of this litigation. On information and belief, and based on the representations made by CBP and the Texas Ranger, the surveillance camera in question belongs to either the U.S. CBP or the Texas Department of Public Safety, Texas Rangers Division.

53.     Plaintiff claims no ownership interest in the subject, "Drawbridge Camera."

54.     The subject camera, this "drawbridge camera," was placed in Plaintiffs' tree by the Texas Ranger in conjunction with U.S. Border Patrol as part of "Operation Drawbridge." According to the Texas Department of Public Safety website, the Texas Governor's Office of Homeland Security, located within the Department of Public Safety (DPS), coordinates border operations for the state. DPS border enforcement activities are thus planned and executed in partnership with local and federal border law enforcement entities.

55.     There exists a cluster of grant programs for federal funding to improve law enforcement preparedness along the land border of the United States. "Operation Stonegarden," for example, is the nation's largest federal border security grant program for states. "Operation Border Star" is the current State of Texas border initiative. Pursuant to "Operation Border Star," regional intelligence is collected by six Joint Operations Intelligence Centers (JOICs) in the border area. These JOICs send intelligence data to the Border Security Operations Center (BSOC) in Austin.

56.     The BSOC is administered by the Texas Rangers, the premier investigative arm of the State of Texas. The Texas Rangers are Texas' "FBI."

57.     "Operation Drawbridge" is part of this border initiative and is included on the DPS webpage as part of Operation Border Star. Together, these programs, along with others, host an extensive multilayered network of surveillance and security infrastructure. State law enforcement, such as the DPS Texas Rangers, employ this infrastructure to conduct multiple, ongoing operations with federal partners for surveillance, interdiction, and border enforcement. A schematic depiction of this extensive infrastructure, taken from the DPS website, is attached hereto as Exhibit "D" for information purposes. A "drawbridge camera," such as that found by Plaintiffs in their Mesquite tree, is clearly displayed among the levels of surveillance infrastructure depicted on Exhibit "D."

58.     Operation Drawbridge, in particular, uses low cost, off-the-shelf wildlife cameras, such as the one Plaintiff found attached to a tree on his private property and as depicted on Exhibit "D." These "drawbridge cameras" have been modified to meet law enforcement needs. Operation Drawbridge is fully operational today with hundreds of cameras located along the border.

59.    The drawbridge cameras are monitored 24 hours, seven days a week by DPS and U.S. Border Patrol in a collaborative effort. These cameras provide the DPS Texas Rangers and U.S. Border Patrol with real-time information. According to the DPS website, here's how Operation Drawbridge works:

60.    A sensor hidden somewhere on the ground, the location of which is unknown to the Plaintiffs, detects activity. The motion sensor, acting as a trigger, activates the drawbridge camera that then captures images of the targeted activity. Pictures are immediately transmitted to a DPS internet server and ingested by DPS proprietary monitoring software. Using the monitoring software, DPS validates the incoming images for potential criminal activity, and then forwards the images and alert notification to five impacted governmental agencies, U.S. Border Patrol among them. The impacted agency then responds to the activity in question. In this manner, and by the use of such cheap, readily available technology, DPS and the law enforcement agencies it is partnered with, enjoy round-the-clock surveillance of an area of interest for purposes of law enforcement. Attached hereto as Exhibit "E," and incorporated herein by reference, is a scheme of the workings of Operation drawbridge as just described, taken form the DPS website.

61.    The drawback cameras are equipped with GPS allowing the agencies, that is, DPS Texas Rangers, and U.S. Border Patrol, to locate the camera that fed the information to them, and then find their illicit prey—be it illegal aliens or smugglers of illicit trade.

62.     Upon information and belief, Plaintiffs maintain that upper levels of management are fully aware of the presence of these drawbridge cameras, and, moreover, because of their GPS capabilities, upper management knows *exactly* where these cameras are and that they are being placed on private property located well beyond 25 miles from the external border of the United States.

63.     Upon information and belief, Plaintiffs maintain that CBP upper management was fully aware of the drawbridge camera Plaintiffs found in a tree on their ranch; that it was placed there without permission and without a warrant; and, knowing its illicit presence where they put it, continued to use the information it transmitted and to otherwise take advantage of the cameras' presence on Plaintiffs' private property. Plaintiffs maintain that upper management knew better, and did it anyway never thinking that any drawbridge camera would ever be found by any property owner who happened to chance upon one hidden in a tree.

63.     The Texas Department of Public Safety, of which the Texas Rangers is a division, refers to its relationship with U.S. Border Patrol vis-à-vis Operation Drawbridge as a "close partnership."

64.     It is Plaintiffs contention that it is by way of this close partnership between the DPS Texas Rangers Division and U.S. Border Patrol that the subject "drawbridge camera," that Defendants, jointly and secretly affixed the surveillance camera to a Mesquite tree on Plaintiffs' private property. Although CBP and the Ranger acted together to achieve legitimate law enforcement objectives, Defendants went about their joint business on the wrong side of the law by proceeding

in violation of a clearly stated federal law prohibiting them from going onto private property located beyond 25 miles from the external border of the United States without a warrant.

**65.** The warrant requirement of 8 U.S.C. §1357(a)(3) is designed to protect the 4th amendment rights of private property owners.

**66.** The fact that both CBP and the Texas Ranger, Defendants herein, each called Plaintiff demanding that the camera be returned to them corroborates plaintiffs' contention that the Defendants acted in concert pursuant to a common design.

**67.** As already mentioned, Plaintiffs do not know over what period of time or for how long the drawbridge camera remained attached to the tree in which it was found, but for however long it was there, it provided Defendants with a continuous presence on Plaintiffs' ranch, for seven days a week, 24 hours per day—and trespassing the entire time. Plaintiff suspects that the drawbridge camera had been in the tree for a considerable time. Plaintiff also does not know whether other similar cameras remain hidden in other trees on his property, but suspects that there may be more.

**68.** Plaintiffs maintain, however, that defendants gave each other substantial assistance, one to the other, in accomplishing the tortious result described herein, that is, the trespassory intrusion onto Plaintiffs' property, without a warrant, resulting in a violation of plaintiffs' constitutional rights.

**69.**     Defendants acted in concert pursuant to an agreement to cooperate in a particular line of conduct to accomplish a particular result. That agreement to cooperate is "Operation Drawbridge."

**70.**     Importantly, Plaintiffs do not assail the policy that is Operation Border Star and Operation Drawbridge. Plaintiffs do however, challenge the implementation of that policy by Defendants in violation of federal law, namely, 8 U.S.C. §1357(a)(3). The violation of that law, in turn, resulted in the trampling by CBP and the Texas Ranger of Plaintiffs' 4th Amendment Constitutional rights thereby giving rise to this cause of action. The question is not about the wisdom of the policy that CBP and the Texas Ranger together put into operation; the question, rather, is whether they have the right to violate clear law that would require them to obtain a warrant or owner consent absent exigent circumstances before putting that policy into operation to begin with.

**71.**     Plaintiffs maintain that agents of the CBP and the Texas Ranger had no discretion at all to disregard the congressional mandate clearly expressed by 8 U.S.C. §1357(a)(3). Their combined duty was to *obey* that law. Instead, they broke the law as an agency and individuals engaged in rogue activity.

**Section VI.**

**<u>CLAIMS FOR RELIEF</u>**

**70.**     For all claims for relief hereinafter made, including those set out in §§VII, through XIII, Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect

as if herein set forth. In addition, each portion below likewise will incorporate by reference any such allegation above it, also as though set forth at length therein.

71.     Each Defendant was at all times an in all matters acting under color of federal and state law in regard to the acts and omissions alleged by Plaintiffs.

## Section VII.

## <u>COMMON LAW TRESPASS</u>

72.     Texas law recognizes a cause of action for trespass to real property. Trespass to real property is an unauthorized entry upon the land of another, and may occur when one enters, or causes something to enter another's property. *Barnes v. Mathis*, 353 S.W. 3d 760, 763 (Tex. 2011).

73.     There are three elements to a trespass cause of action: (1) entry (2) onto the property of another (3) without the property owner's consent or authorization.

74.     Plaintiffs maintain that Defendants, known and unknown trespassers, have entered Plaintiffs' property repeatedly, over the landowners' objection. On such occasions, as described herein, Defendants entered onto Plaintiffs' property without a warrant, and without the legal justification that exigent circumstances might provide.

75.     Defendant's trespass has been continuing and ongoing and will likely continue barring judicial relief. The Texas Supreme Court has determined that "an injury to real property is

considered permanent if, even though the injury can be repaired, fixed, or restored, it is substantially certain that the injury will repeatedly continually, and regularly recur, such that future injury can be reasonably evaluated."

## Section VIII.

## CRIMINAL TRESPASS

76.     A person who enters or remains on property…without the effective consent when the person had notice that entry was forbidden *or received notice to depart but failed to do so* commits criminal trespass [emphasis added]. Tex. Penal C. §§30.05(a) and 107(a)(5). Notice may be an oral or written communication by the owner. Tex. Penal C. §30.05(b)(2). Criminal trespass is ordinarily a Class B misdemeanor. However, if the actor carries a deadly weapon during the commission of the offense, it is a Class A misdemeanor. Tex. P. C. §30.05(d)(1) & (2).

77.     Under Texas law, Defendants have criminally trespassed onto Plaintiffs' private property. For purposes of the present action, this fact serves as an aggravating factor.

## Section IX.

## WARRANTLESS POWERS OF IMMIGRATION OFFICERS

78.     U.S. Code, Title 8, §1357, et seq., *Powers of Immigration Officers and Employees*, subsection (a)(3) (Powers without Warrant), provides that,

> "…any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without a warrant…*within a distance of*

*twenty-five miles from any…external boundary* [of the United States]…to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent illegal entry of aliens into the United States…". [emphasis added]

79.    18 U.S. Code §2236—Searches Without Warrant, provides,

Whoever, being an officer, agent, or employee of the United States or any department or agency thereof, engaged in the enforcement of any law if the United States, searches any private dwelling used and occupied as such dwelling without a warrant directing such search, **or** maliciously and **without reasonable cause searches any other** building or **property without a search warrant**, shall be fined under this title for a first offense; and for a subsequent offense, shall be fined under this title or imprisoned not more than one year, or both. [emphasis added]

80.    Plaintiffs maintain that Defendants, individually and while acting in concert with each other, have violated the clearly stated mandate of the aforementioned statutes.

## Section X.

## <u>CLAIMS FOR TRESPASS</u>

81.    Plaintiff maintains that agents for CBP, with names unknown, in conjunction with the Texas Ranger, have trespassed onto Plaintiffs' land in violation of the aforementioned state and federal laws. In perpetrating their trespass against Plaintiff's property rights, Defendants repeatedly referred to being within their rights, specifically mentioning the "25-mile" rule. Plaintiff having presented his complaint to U.S. CBP by letter dated, April 9, 2010 (Exhibit "A") notwithstanding, agents of CBP continued to trespass at will, day or night, which trespassing will undoubtedly continue if judicial relief is denied. Conversely, such unwarranted police intrusions will certainly cease if judicial relief is granted.

**82.**     Plaintiffs maintain that in perpetrating their trespass onto Plaintiffs' property, agents of CBP and the Texas Ranger acted in violation of 8 U.S.C. §1357 (a)(3) because Plaintiffs' ranch is situated beyond 25 miles from the external boundary of the United States. CBP agents were therefore required to have either a warrant, landowner consent, or exigent circumstances none of which were present on the many times Defendants trespassed onto Plaintiffs' property. As such Defendants acted *beyond* the outer parameters of their line of duty. Their actions do not fall within the scope of official duties of government agents.

**83.**     Plaintiffs maintain that the trespass onto Plaintiffs' property by agents of CBP, in conjunction with the Texas Ranger, constitutes an unlawful search of Plaintiffs' property, without a warrant.

### Section XI.

### CONSTITUTIONAL CLAIMS

**84.**     Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth. In addition, each portion below likewise will incorporate by reference any such allegation above it, also as though set forth at length therein

**85.**     Plaintiff has a constitutional right against unreasonable searches and seizures under the 4th Amendment to the United States Constitution, and brings forth this claim under the auspices thereof.

**86.** Plaintiffs maintain that the on-going, unlawful, warrantless searches of Plaintiffs' property by Defendants, unsupported by any arrest, constitutes a violation of Plaintiffs' 4th amendment right to privacy. Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the fourth amendment subject only to a few specifically established and well-delineated exceptions.

**87.** The warrantless placement by CBP in conjunction with the Texas Ranger of a surveillance camera in a tree on Plaintiffs' property is *per se* unreasonable because neither agency had lawful authority to be on Plaintiffs' property to begin with.

**88.** Defendants' violation of Plaintiffs' 4th amendment right gives rise to this "Bivens," federal cause of action for monetary damages. *Bivens vs. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L Ed.2d 619 (1971).

**Section XII.**

**<u>DECLARATORY RELIEF</u>**

**89.** Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth. In addition, each portion below likewise will incorporate by reference any such allegation above it, also as though set forth at length therein

**90.** Plaintiffs brings forth this claim for declaratory relief pursuant to Fed. R. Civ. P. 57 and the *Declaratory Judgement Act*, 28 U.S.C. §2201 as there exists a genuine controversy between

the parties herein that would be terminated by the granting of declaratory relief because this would clear up the misapprehension of law that U.S. CBP and company are laboring under.

**91.**     The on-going trespass by agents of CBP, in conjunction with the Texas Ranger, constitutes a violation of the warrantless authority given to CBP under 8 U.S.C. §1357(a)(3) and as such constitutes an unreasonable search and a violation of Plaintiffs' 4th Amendment Constitutional right to be free from unwarranted governmental searches.

**92.**     In pursuing their joint efforts, Defendants have conducted themselves as described herein, and recently threatened Plaintiff, Ricardo D. Palacios with criminal charges unless he surrendered the subject camera referred to earlier. When threatened action by government is concerned, Plaintiff need not expose himself to liability before bringing suit to challenge the basis for the threat. This is exactly what the Declaratory Judgement Act was designed to address.

**93.**     Plaintiff asks the Court to declare its rights as a private property owner as against those of U.S. CBP as a law enforcement agency vis-à-vis the proper application of 8 U.S.C. §1357(a)(3).

**Section XIII.**

**<u>DAMAGES</u>**

**94.**     Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

**95.**     As a direct result of Defendants' ongoing trespass onto Plaintiffs' property, plaintiff has suffered general damages including mental and emotional distress for which Plaintiffs seek compensation in the amount of $500,000.00;

**96.**     Defendant's conduct was intentional, or recklessly or callously indifferent to Plaintiff's protected for which Plaintiffs are entitled to punitive damages.

**97.**     It was necessary for Plaintiffs to hire the undersigned attorneys to file this lawsuit. Upon judgement, Plaintiffs are entitled to a n award of attorney fees and costs under Fed. R. Civ. P. 57, and the Declaratory Judgement Act, 28 U.S.C. §2201.

**98.**     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## Section XIV.

## <u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully requests the Court to enter judgement as follows:

A. That the Court declare that Plaintiffs' property is beyond 25 miles from the external boundary of the United States;

B. That the Court declare that Defendants' entering Plaintiffs' private property without a warrant; without exigent circumstances; and, without landowner consent exceeds the outer parameters of authority granted to U.S. CBP for warrantless excursions onto private property which is limited to 25 miles from the external boundary of the United States;

C. That Plaintiffs be awarded compensatory damages in the amount of $500,000.00;

D. That Plaintiffs be awarded punitive damages;

E. That Plaintiffs be awarded attorney fees; and,

F. That Plaintiffs be granted any further relief to which they may be entitled at law or equity and as the Court may deem proper.

Respectfully submitted,

*David Almaraz*

_____
David Almaraz
David Almaraz Law Office
1802 Houston St.
Laredo, Texas 78040
T#. (956) 727-3828
Email: almaraz@netscorp.net

*Raul Casso*

_____
Raul Casso
Raul Casso IV Law PLLC
2107 Shiloh Dr. #10
Laredo, Texas 78045
T#. (956) 795-1847 / (956) 282-1748
Email: raul.casso@cassocustomslaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **RICARDO D. PALACIOS,** | § | |
| **Individually and as General** | § | |
| **Partner for the JUAN SALINAS** | § | |
| **RANCH, LTD. a Texas Limited Liability** | § | |
| **Company** | § | |
| | § | |
| **Plaintiffs,** | § | **Civil Action No. 17-cv-244** |
| | § | |
| | § | |
| | § | |
| **vs.** | § | |
| | § | |
| | § | |
| **CHIEF PATROL AGENT** | § | |
| **MARIO MARTINEZ,** | § | |
| **UNKOWN AGENTS OF THE** | § | |
| **UNITED STATES CUSTOMS** | § | |
| **AND BORDER PROTECTION,** | § | |
| **AND TEXAS RANGER ERNESTO** | § | |
| **SALINAS OF THE TEXAS** | § | |
| **DEPARTMENT OF PUBLIC SAFETY** | § | |
| **TEXAS RANGER DIVISION** | § | |

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and have verified that such filing was sent electronically using the CM/ECF system to the following: Chief Patrol Agent, Mario Martinez, of the U.S. Customs and Border Patrol, by and through Assistant U.S. Attorney Hector Ramirez

at 11204 McPherson Rd., Ste. 100-A, Laredo, Texas 78045; to the United States, by and through Assistant U.S. Attorney Hector Ramirez at 11204 McPherson Rd., Ste. 100-A, Laredo, Texas 78045; and Texas Ranger Ernesto Salinas, with TxDPS, Texas Ranger Division, Company D, by and through Mr. Seth Byron Dennis, Assistant Attorney General, P.O. Box 12548, Capital Station, Austin, Texas, 78711.

Respectfully submitted,


*David Almaraz*
_____
David Almaraz
David Almaraz Law Office
1802 Houston St.
Laredo, Texas 78040
T#. (956) 727-3828
Email: almaraz@netscorp.net

*Raul Casso*
_____
Raul Casso
Raul Casso IV Law PLLC
2107 Shiloh Dr. #10
Laredo, Texas 78045
T#. (956) 795-1847 / (956) 282-1748
Email: raul.casso@cassocustomslaw.com

# EXHIBIT A



## RAUL CASSO IV LAW PLLC
### LEGAL SERVICES IN PORT LAREDO

a. 2107 Shiloh Dr # 10 Laredo TX 78045
m. POBOX 450896 Laredo TX 78045
t. (956) 282-1748

e. raul.casso@cassocustomslaw.com
w. www.cassocustomslaw.com

December 11, 2017

U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530-0001                    VIA CERTIFIED MAIL

ATTN: Hon. Lee J. Lofthus
      Assistant Attorney General for Administration
      Justice Management Division

RE:    CA# 17-cv-244; Service of Summons and Complaint

Dear Sir,

Pursuant to FRCP 4(i)(1)(B) and 28 C.F.R. §0.77(j), enclosed please find a copy of the complaint and summons as filed in the above referenced cause of action.

Sincerely,

Raul Casso
Attorney for Plaintiffs

cc.    Mr. Ricardo D. Palacios
       Mr. David Almaraz



casso@cassocustomslaw.com
www.cassocustomslaw.com

...eneral for Administration...

Division

...vice of Summons and Complaint

...and 28 C.F.R. §0.77(j), enclosed please find a copy of the complaint and
...e referenced cause of action.

Raul Casso
Attorney for Plaintiffs

cc.     Mr. Ricardo D. Palacios
        Mr. David Almaraz

# EXHIBIT B

**RICARDO D. PALACIOS**
ATTORNEY AT LAW
P.O. Box 27
Encinal, Texas  78019

BOARD CERTIFIED
OIL, GAS, AND MINERAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

TELEPHONE 956-948-5482
FAX            956-948-7066
email: ricpala@live.com

April 9, 2010

Certified Mail No.  7004 1350 0001 0201 0147

RETURN RECEIPT REQUESTED

Chief Patrol Agent Robert L. Harris
U. S. Customs and Border Protection
207 W. Del Mar Blvd.
Laredo, Texas  78041

Dear Agent Harris:

## COMPLAINT

Because of two unwarranted incidents that occurred in the early morning hours of April 4, 2010, I hereby file a formal complaint with the expectancy that these type of incidents can be avoided in the future.

## BACKGROUND INFORMATION AND CIRCUMSTANCES

First some background:--

For years my son and I have lived at our ranch on IH 35, at about the 35 mile marker, east side frontage road, 3 miles south of Encinal, Texas, several miles beyond the functional equivalent 25 mile barrier from the Rio Grande River;  We have a small cattle operation, and I have a law practice here at home.  I have practiced law in this county for 39 years.  Years ago I was a First  Assistant District Attorney for Webb County, my father was a U. S. Customs Agent (I am told the equivalent of a plainclothes ICE Agent today), and my grandfather was Sheriff of Webb County.  My son is a student at Texas A & M International.  We travel to and from Laredo and Encinal daily.

In the last couple of years and particularly after the new checkpoint moved north to its present location  we have seen Border Patrol activity increase substantially.  First we

1

were not used to being photographed as we drove into the check point, now we are, and if south bound we are photographed again. The main change that we noticed however were the roving patrols, particularly when driving on the frontage road in front of our house. It is as the agents do not realize people live on ranches next to the frontage road. It appears that to the agents everyone on the frontage is violating the law. There is a presumption of guilt instead of the reverse.

The increased activity has led to us being stopped at random by roving patrols with no probable cause. On one occasion my son was coming back home from Encinal, and was pulled over and with guns pulled, braced against the hood of his pickup simply because he increased his speed to hurry home and avoid a confrontation with Border Patrol.;

On several occasions your agents have caused "bail outs" onto our land. On three occasions my son and I have had to repair the broken barbed wire fence caused by these bail outs.

I was stopped without probable cause simply because I stopped at an under pass to secure cargo.

There were many "fishing expeditions" onto our ranch, (private property, thus trespassing)where I ran Border Patrol off of my ranch. There were so many, that I was finally forced to put up a large gate at the entrance to the ranch. For 100 or more years the ranch had always had an open gate. I have spoken to Captain Robert Most about this problem. Needless to say we do not see eye to eye. Since putting up the gate I had not had any incidents of trespassing, until the one I report below.

There have been many occasions at night when as we drive home from either Laredo or Encinal, your officers suddenly come speeding behind our vehicles, expecting us to scare and bolt, which of course we do not, but causing serious apprehension because of the unsafe way that they drive their vehicles. They get so close to our vehicles that if you are driving you cannot see the headlights of the Border Patrol vehicle behind you.

Being a lawyer and cherishing my civil rights, I have shared with my children, one of whom lives with me that preserving our civil rights is paramount, even to the extent of giving up a sense of security. In line with this, and given the environment created by the Border Patrol in the last several years, I have insisted on our privacy in refusing to let roving patrols on our ranch, and we refuse to tell inspectors at the check point where we are going and where we are coming from, and my children have followed my example. Last time I heard, this is still a free country, and we can come and go as we please, and do not have to tell the inspectors at the check point where we have been nor where we are going. I realize when I do this that I may, unlawfully, be sent to secondary inspection and delayed for hours, but preserving civil rights is more important to me than the delay that this is going to cause. Your officers have acknowledged to me that they cannot insist on getting information on our destination, and that it is not a violation to refuse to give more information.

2

With all of the forgoing in mind, I now report on the two incidents involving my two sons that occurred on Easter Sunday morning at about 1 a.m. at the check point north of Laredo on Interstate 35.

## INCIDENTS

**First Incident.** At about 1 a.m. April 4, 2010, my two sons drive into the check point going northbound, driving home after spending a few hours with friends in Laredo. They were not even asked if they were U.S. citizens. They were asked where they were going, and when they responded home, they were asked where home was, and they responded that it was none of the agent's business. This triggered a false alert from the dog handler Esparza, and they were ordered to secondary. Immediately upon arrival at secondary, my son the passenger was swarmed by about ten officers, thrown to the ground, handcuffed and taken inside to the detention cell. He did not even raise his hands either in offense or defense. The 10 officers appeared out of the dark like goons and assaulted him. They did not harm my other son, the driver, who similarly did not raise his hands in either offense or defense. Officer Champion was particularly offensive, and seemed to take great pleasure in his assaults. He later threw my son to the floor in the detention cell, my son being handcuffed at the time.

They were held for about an hour and a half, and released after there was no legal reason for holding them. Actions by the Border Patrol were in retaliation for not given information on where they were going. Excessive force and brutality, that was not necessary.

**Second Incident**. To use an old cliché, as if to put icing on the cake, when my sons arrived at home, after leaving the check point, drove up the hill to our gate, there parked in front of our gate, on our private property, some one hundred yards east of the frontage road, trespassing and intruding, one of your large olive drab unmarked pickups with its elevated night scope/camera pointing east toward our houses and yard.

This infuriated both my sons, but especially the passenger that had just been roughed up by the officers at the check point. He approached Lopez the driver of the pick up and told him to leave because he was trespassing and Lopez refused, and stated that he was going to spray him.

I arrived at this point having been called by my other son the driver. I told Lopez and the other four officers that had since arrived that they were on private property, and that they should leave. I called Laredo for the Sheriff's department to come and take a charge of trespassing against your officers. They never arrived. The officers would not leave, insisting that my son had assaulted Lopez by not letting him get out of the pick up, and insisted that all of this be sifted through by a supervisor. After waiting a few minutes Supervisor Elwynn Sherman arrived, and asked questions of my son and of Lopez, and to make a long story short, offered to shake hands and walk away, which we all did. Officer Sherman was the only officer on deck that seemed mature and intelligent enough to disarm a dangerous situation. My son the driver states that if it had not been for me and

Sincerely,

Rdp                                    Ricardo D. Palacios

5

# EXHIBIT C



**U.S. Customs and
Border Protection**

April 19, 2010

Mr. Ricardo D. Palacios
P.O. Box 27
Encinal, Texas  78019

Dear Mr. Palacios:

Thank you for your letter of April 9, 2010, where you raised several issues regarding Border Patrol operations and agent interaction with you and your sons.  I appreciate you bringing this matter to my attention.  Rest assured that the United States Border Patrol takes all complaints, allegations and concerns seriously and where needed, conducts an investigation to determine the validity of a complaint or allegation.  If corrective action is required, we will take such action. As the Nation's largest uniformed Federal law enforcement organization, we are entrusted with protecting over 300 million citizens and residents--a mission we take very seriously.

I applaud your commitment to protecting civil rights and civil liberties and your father and grandfather's service in law enforcement.  Once again, thank you for your letter.

Sincerely,

Rosendo Hinojosa
Acting Chief Patrol Agent

EXHIBIT C                                                                                                    Page **1** of **1**

# EXHIBIT D



# EXHIBIT E

# OPERATION DRAWBRIDGE
## How it Works:



All of this occurs in approximately 60 seconds

1. The sensor detects activity, and at the same time, the camera captures an image

2. The picture is immediately transmitted to a DPS internet server and ingested by DPS proprietary monitoring software

3. Using the monitoring software DPS jointly validates the incoming images for potential criminal activity along with USBP, then forwards the image and alert notification to all impacted agencies.

4. A follow up phone call from DPS partners is made to the US Border Patrol Agents in the area, alerting them to the criminal activity.

5. USBP Agents are dispatched to the scene and apprehensions are made, or criminal activity is pushed back to the Texas/Mexico border

DPS Border Security Operations Center

DPS Joint Operations Intelligence Centers

Texas DPS Fusion Center

Border Intel Centers

TXDPS Communications